**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| THE PEOPLES STATE BANK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:09-cv-01496-TWP-MJD |
| ) | |
| FIRST SECURITY LEASING, INC., ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter comes before the Court on Defendant First Security Leasing's ("First Security") Motion for Summary Judgment [Dkt. 74] and Plaintiff The Peoples State Bank's ("Peoples") Cross-Motion for Summary Judgment [Dkt. 82]. Peoples brought this action seeking to rescind the assignment of an equipment lease agreement from First Security to Peoples on the basis of mutual mistake. For the reasons set forth below, both parties' motions are **DENIED**.

**I.     FACTUAL BACKGROUND**

**A.     The Parties**

Peoples is a financial institution located and chartered to conduct business in the State of Indiana. First Security is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. First Security provides lease finance products and services to corporations and governmental entities. At the time of the transaction at issue, First Security was a wholly-owned subsidiary of Crews and Associates, Inc. ("Crews"), an Arkansas-based full service investment banking firm. Crews has been one of three to five investment banking brokerage firms with which Peoples has done business since at least 1997, and Peoples has an ongoing business relationship with Crews.

**B.     The Transaction**

The equipment lease transaction that is the subject of this litigation involves Rental Schedule No. 7 to Master Equipment Lease Agreement No. HGF051005, originally entered into by Leasing Innovations, Inc. ("Leasing Innovations"), as lessor, and Wildwood Industries, Inc. ("Wildwood"), as a lessee, on June 2, 2005 (the "Wildwood Lease"). The subject of and security for the Wildwood Lease was to be new specialized manufacturing equipment with a purchase price of $1,800,000.00. The Wildwood Lease was additionally personally guaranteed by the owners of Wildwood, Toni and Gary Wilder (the "Wilders"). First Security approached Peoples about the availability of the Wildwood Lease for purchase from Leasing Innovations in February 2006.

Because the Wildwood Lease had a one dollar buyout at the conclusion of the lease, Peoples treated the Wildwood Lease as a loan to Wildwood and analyzed it as such. Gregory Hartz ("Hartz"), People's Credit Risk Manager and Vice President who was responsible for assessing loans, conducted People's credit analysis of the Wildwood Lease and participated in the loan approval process. Hartz reviewed Wildwood's 2004 and 2005 financial statements, Wildwood's 2002 and 2003 tax returns, the Wilders' 2005 financial statement, the Wilders' 2002 and 2003 tax returns, the Wilders' May 2005 credit report, internet articles about Wildwood's background and products, and a Dunn & Bradstreet report. Hartz completed Peoples' credit analysis worksheets and spoke with another of Wildwood's lenders regarding Wildwood's business and payment history. After reviewing and analyzing the information, Hartz created a Credit Memo containing the analysis he performed prior to the approval of the Wildwood Lease purchase. Hartz presented the Credit Memo to Peoples' Executive Loan Committee, which approved the loan on March 2, 2006.

The information used in Peoples' loan approval process was provided by First Security, who obtained the information from Wildwood and Leasing Innovations. Peoples knew that First Security was acting as an intermediary broker for the transaction and did not originate the Wildwood Lease. Peoples also knew that any information provided by First Security was created by Wildwood or Leasing Innovations and was not created by First Security. First Security did not represent to Peoples that they conducted any due diligence related to the transaction or that they conducted any independent evaluation of the creditworthiness of Wildwood or the value of the collateral. First Security did not make any warranties or representations regarding the accuracy of the information that it transmitted from Wildwood and Leasing Innovations to Peoples. At no time did Peoples visit the Wildwood facility to inspect the purported collateral.

Peoples ultimately purchased the Wildwood Lease through First Security, who was assigned the lease from Leasing Innovations. Leasing Innovations executed a Bill of Sale and Assignment of the Wildwood Lease to First Security on March 17, 2006, effective March 22, 2006. On March 22, 2006, Peoples wired $1,863,978.08 to First Security, which included $1,807,145.00 for the purchase price of the lease to be remitted to Leasing Innovations, plus the $56,833.08 broker's fee to be retained by First Security. The same day, First Security assigned the Wildwood Lease to Peoples via a Bill of Sale and Assignment of Lease. First Security then transferred the purchase price, minus the broker's fee, to Leasing Innovations on March 23, 2006. As of the date of the transaction, both Peoples and First Security believed that the Wildwood Lease was secured by the manufacturing equipment.

### C. Wildwood's Default, Bankruptcy and Fraud

Wildwood made payments to Peoples under the terms of the Wildwood Lease for over two years, through November 1, 2008. Wildwood failed to make its December 1, 2008 payment, thus defaulting under the terms of the lease. On March 5, 2009, Wildwood was placed into an involuntary bankruptcy proceeding. The trustee commenced an investigation into Wildwood's assets and liabilities and discovered that Wildwood had participated in a fraudulent scheme with respect to numerous equipment leases and purchases, including the Wildwood Lease. Representatives of Wildwood conspired with a manufacturer of equipment to obtain financing for equipment that, in actuality, was never manufactured. The manufacturer generated false invoices for the purported purchase price of the equipment and generated corresponding counterfeit serial number tags. Different serial number tags were then repeatedly applied to and removed from the same pieces of equipment at the Wildwood facility when lenders would conduct physical inspections of the equipment. On November 4, 2009, Peoples filed suit against First Security seeking rescission of the purchase of the Wildwood Lease, and First Security removed the matter to this Court on December 7, 2009.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009) (citation

4

omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 395 (7th Cir.1997) (citations and internal quotations omitted).

Here, the Court is faced with cross-motions for summary judgment. However, these motions are not subject to a unique standard. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Tippecanoe Assocs., LLC v. OfficeMax North America, Inc.,* No. 1:07-cv-1660-SEB-JMS, 2009 WL 798745, at *3 (S.D. Ind. March 20, 2009) (citation and internal quotations omitted).

## III.   DISCUSSION

The parties have filed cross motions for summary judgment, both seeking a determination of whether, under these circumstances, Peoples is entitled to the equitable remedy of rescission as a matter of law. First Security argues that Peoples is not entitled to rescission because (1) Peoples cannot prove that a mistake existed; (2) the risk of mistake should be allocated to Peoples; and (3) Peoples cannot show that the parties can be returned to their positions prior to the transaction. Conversely, Peoples argues that it is entitled to rescission as a matter of law

based upon mutual mistake of fact due to the non-existence of the collateral, which they argue goes to the essence of the parties' agreement, and that the undisputed facts show that all requirements for the remedy of rescission have been met.

### A. Indiana Law on Mutual Mistake

The parties agree that Indiana law controls the disposition of this case.[1] Rescission based upon mutual mistake falls under the court's equity jurisdiction and is within the discretion of the trial court. *Barrington Mgt. Co., Inc. v. Paul E. Draper Family Ltd. P'ship*, 695 N.E.2d 135, 141 (Ind. Ct. App. 1998). Under Indiana law "[w]here both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if because of the mistake a quite different exchange of values occurs from the exchange of values contemplated by the parties." *Wilkin v. 1st Source Bank*, 548 N.E.2d 170, 172 (Ind. Ct. App. 1990); *see also Tracy v. Morell*, 948 N.E.2d 855, 864 (Ind. Ct. App. 2011), *The Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Genrette Secs. Corp.*, 9 F. Supp. 2d 994, 1004 (N.D. Ind. 1998); *Am. United Life Ins. Co. v. Rest. Hospitality Ass'n of Ind.*, 898 N.E.2d 419, 425 (Ind. Ct. App. 2008).

In order to demonstrate mutual mistake, the mistaken fact complained of must be one that is the essence of the agreement, the "*sin qua non*," or efficient cause of the agreement and must be such that it animates and controls the conduct of the parties. *Stainbrook v. Low*, 842 N.E.2d 386, 397 (Ind. Ct. App. 2006); *Breeden Revocable Trust v. Hoffmeister-Repp*, 941 N.E.2d 1045, 1054 (Ind. Ct. App. 2010). In circumstances where mutual mistake exists, Indiana's view is that a contract never existed because the minds of the parties never met, thus the essential requirement of mutual assent is not satisfied. *Wilkin*, 548 N.E.2d at 172.

---

[1] The Bill of Sale and Assignment agreement between First Security and Peoples did not contain a choice of law provision, and both parties refer to Indiana law in their analysis. [First Security's Brief, Dkt. 75 at 20; Peoples' Brief, Dkt 83 at 9.]

In addition to a showing of mistake of fact on the part of both parties, the party seeking rescission has the burden of proving that the parties can be returned to the status quo. *Barrington Mgt. Co. Inc.*, 695 N.E.2d at 141. "In the event of rescission, the parties must return any items of value received pursuant to the contract and must restore all benefits accrued under the contract." *Yates-Cobb v. Hays*, 681 N.E.2d 729, 733 (Ind. Ct. App. 1997). However, an exact or literal return to the status quo is not necessary. *Horine v. Greencastle Prod. Credit Ass'n*, 505 N.E.2d 802, 806 (Ind. Ct. App. 1987).

**B.     Existence of the Mutual Mistake**

As an initial matter, First Security argues that there is a dispute of material fact as to whether there was a mistake entitling Peoples to rescission in the first place – *i.e.* Peoples cannot show with certainty that the collateral never existed. First Security points out that some machinery existed on Wildwood's premises and that the Wilders would switch the serial numbers on the equipment whenever they were inspected; therefore, First Security argues that there is a possibility that one of the pieces of equipment present at the facility was actually the equipment designated as collateral in the Wildwood Lease. However, Peoples has presented evidence that no new equipment was manufactured during the years under investigation and no equipment was shipped to Wildwood after 2003, and the equipment that was the subject of the Wildwood Lease was purportedly manufactured in 2006. [Hudson Plea Agreement, Dkt. 83-7 at 10-12, Certified Record of Proceedings in *United States v. Gary Wilder and Toni Jo Wilder*, Dkt. 83-9 at 45-6.] First Security has presented no evidence that any equipment was manufactured in 2006. Because Peoples has established that the collateral for the Wildwood Lease never existed, the Court finds that there is no dispute of material fact on this point and finds that both parties were mistaken as to the existence of the collateral, and a mutual mistake does exist in this case.

### C.        Assumption of the Risk of Mistake

First Security next argues that Peoples bore the risk of mistake and thus is not entitled to the remedy of rescission. First Security advances two arguments as to why Peoples should bear the risk of mistake: first, under Restatement Second of Contracts § 154, Peoples bore the risk of the mistake, and second, the risk was inherent in the agreement.

First Security argues that under Restatement Second of Contracts § 154, rescission based on a theory of mutual mistake is not available to a party that bore the risk of mistake. Section 154 provides that "[a] party bears the risk of a mistake when … the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." *Grey Direct v. Erie Ins. Exch.*, 460 F.3d 895, 899-900 (7th Cir. 2006) (citing Restatement 2d of Contracts § 154(c) (1981)). However, Indiana courts have not adopted § 154 and thus, as demonstrated in the *Wilkin* case, such an analysis is inapplicable in this case.

In *Wilkin*, a bank, as the personal representative of the estate of a famous artist's widow, sold the decedent's home to the plaintiffs. 548 N.E.2d at170. After the closing, the plaintiffs complained that the house had been left in a cluttered state and required cleaning. The bank and plaintiffs agreed that the plaintiffs could keep any personal property left in the home if they cleaned the property themselves. During the cleaning, the plaintiffs discovered valuable works of art that had been left in the home. The *Wilkin* court found that there was no "meeting of the minds" regarding the purchase, sale or other disposition of the artwork, and thus there was no agreement between the parties for these items. *Wilkin*, 548 N.E. 2d at 171. The decedent's will had a separate provision for the disposition of artwork, and by the terms of the will all of the works of art created by decedent's husband that were not specifically devised were to be sold and

the proceeds distributed to the family; thus the artwork was not considered personal property and was outside of the scope of what was contemplated by the parties in their exchange. *Id.*

Although under a § 154 analysis it is likely that the bank would have borne the risk of mistake as to the existence of the artwork in the home, the *Wilkin* court focused upon the lack of mutual assent to find that no contract was ever formed as to the transfer of the artwork and did not analyze which party should have borne the risk of the mistake. *Id.; see also The Lincoln Nat'l Life Ins. Co.*, 9 F. Supp. 2d at 1005 (the court specifically declined to determine whether Indiana follows § 154). In the case cited by First Security in support of their argument that § 154 applies, *Ball v. Versar, Inc.*, 454 F. Supp. 2d 783 (S.D. Ind. 2006), the court determined that defendant bore the risk of mistake based upon a contract provision that allocated the risk to that party, not on the basis of § 154. *Id.* at 805-6 (plain language of the contract allocated risk of mistake about environmental conditions to defendant, even though such conditions were material to the company's agreement to perform). This Court too declines to apply § 154 to determine whether one party or the other bore the risk of mistake in this case.

Alternatively, First Security argues that Peoples is not entitled to rescission based on mutual mistake because the risk that a borrower might provide fraudulent information concerning a transaction, and that collateral could be insufficient to cover the value of the loan in the event of default, are inherent and ordinary risks to a loan transaction. A party may not rescind a contract on the basis of a risk it knew was inherent in the agreement. *Jay Co. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 912 (Ind. Ct. App. 1998). In *Jay Co.*, Jay County sought to avoid an electricity requirements contract on the basis of mutual mistake, arguing that a material feature of the all-requirements contract was the parties' understanding that the Wabash Valley Power Association's investment in a nuclear

9

energy project would result in more reliable and economic power, and that the abandonment of the project due to project delays and cost overruns constituted a mutual mistake. The Indiana Court of Appeals agreed with the trial court's conclusion that an erroneous prediction of future events is not covered by the doctrine of mutual mistake, and that the result was a risk that was inherent in the agreement. *Id.* (citing *U.S. v. Southwestern Elec. Coop., Inc.*, 869 F.2d 310, 314 (7th Cir. 1989)). Thus, Jay County was not entitled to the remedy of rescission. *Id.*

The district court in the Western District of Pennsylvania dealt with a case factually similar to the present case in which the court found that mistake regarding the existence of collateral was not an inherent risk to the agreement, and determined that allocation of risk was based upon contract. In *FirstMerit Bank, N.A. v. Vision Fin. Grp., Inc.*, No. 04-1497, 2006 WL 2806566 (W.D. Pa. Sept. 28, 2006), Vision Financial provided lease financing to Nanomat, a nanotechnology business, to acquire several pieces of equipment. In November 2002, Nanomat requested financing on a furnace, which it represented that it purchased in March 2002. Vision Financial contacted FirstMerit concerning the possible assignment of the Nanomat furnace lease to FirstMerit. Vision Financial acted as a liaison between Nanomat and FirstMerit, providing FirstMerit with information submitted by Nanomat to Vision Financial including financial records, credit applications, information about the furnace, and personal and company tax returns. FirstMerit reviewed Nanomat's creditworthiness and researched the furnace with the manufacturer. Several representatives from FirstMerit toured the Nanomat facility and were shown a piece of equipment that Nanomat's representative claimed was the subject furnace. Vision Financial executed a sale and leaseback agreement with Nanomat on December 24, 2003, and on January 27, 2003, Vision Financial assigned the lease of the furnace to FirstMerit under an assignment and assumption agreement for the amount of the lease plus a fee in the amount of

approximately $56,000.00 to Vision Financial. In August 2004, FirstMerit discovered that the furnace was never sold to Nanomat and requested a rescission of the assignment of the furnace lease due to mutual mistake. The parties agreed that a mutual mistake of fact occurred as a result of Nanomat's fraud. The court, applying Ohio law, first determined that "[i]t is a basic assumption of a lease that the item being leased actually exists." *Id.* at *5. The court further determined that the undisputed evidence of record supported the conclusion that the assignment of a lease of nonexistent equipment for which the assignee is unable to recoup the amount paid for the transfer of the lease constituted a material effect on the agreed exchange of performances. *Id.* at *6. Additionally the *FirstMerit Bank* court recognized that Restatement § 154 applied under Ohio law, but determined that the language in the assignment agreement clearly allocated the risk of mistake regarding the existence of the furnace to FirstMerit. *Id.* The agreement contained specific language that disclaimed Vision Financial's representations and warranties "as to any matter whatsoever concerning the [Furnace], including, without limitation, any warranty of title…." *Id.* The court found that this "effective exculpatory language" clearly expressed the parties' intent to allocate the risk to FirstMerit. *Id.* at *7.

In the present case, there is nothing in the agreement between First Security and Peoples that would clearly allocate the risk of mistake to either party. It cannot be said that the mistaken fact – the non-existence of the collateral – is the type of risk that is inherent in the agreement. This situation is unlike that in *Jay Co.* in that the error was one that existed at the time the parties contracted, not some future event that was yet to occur. This Court agrees with the *FirstMerit Bank* court's conclusion that the existence of the collateral in a lease assignment is a basic assumption of the agreement, and not one that is an inherent risk in the transaction. The risk that Peoples bore was the risk of losing money on the transaction caused by Wildwood's failure to

pay, which is a risk that every investor bears. *Lincoln,* 9 F. Supp. 2d at 1005. The risk that the collateral did not exist due to borrower's fraud is not a risk inherent in the agreement.

Although Indiana does not follow Restatement § 154 in allocating risk of mistake, case law does allow for risk of mistake to be allocated to a party via contract. *See Ball*, 454 F. Supp. 2d at 805-6. The Bill of Sale and Assignment of Lease contains no disclaimer similar to that in *FirstMerit Bank* regarding the existence or condition of the collateral, nor is there any language in the agreement that allocated any risk of unknown conditions to Peoples, similar to the party in *Ball*. Therefore, neither party in this case has been allocated the risk of mistake either through contract or through an inherent risk in the agreement.

**D. Returning the Parties to the Status Quo**

In order for a party to be entitled to the remedy of rescission based upon mutual mistake, it must also be able to show that the parties can both be returned to the status quo. Peoples argues that the parties can be returned to the status quo by returning the lease to First Security and First Security returning the consideration paid for the assignment, minus the funds already received from Wildwood. First Security argues that the transaction was, in actuality, a three party arrangement involving Leasing Innovations in which First Security served the role of broker, not of buyer and seller in the ordinary sense; therefore, First Security cannot be returned to the status quo because it effectively only received the broker's fee.

First Security essentially asks the Court to apply the contemporaneous document doctrine. Ordinarily, if the language of the contract is unambiguous, the parties' intent will be determined from the four corners of the contract. *Whitaker v. Brunner*, 814 N.E. 2d 288, 293-94 (Ind. Ct. App. 2004). In Indiana, however, the contemporaneous document doctrine permits a court to determine the intent of the parties to an agreement by examining documents that were

drafted and executed contemporaneously. *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1273 (Ind. Ct. App. 2001). "[I]n the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject-matter are construed together in determining the contract." *Ruth v. First Fed. Sav. and Loan Ass'n of LaPorte Cnty.*, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986). The documents need not be executed simultaneously, and the rule may still apply when documents have been executed at substantially the same time as part of the same transaction. *Id.* at 1108. The application of the rule is determined on a case-by-case basis, and should be applied cautiously when the documents involve different parties. *Murat v. South Bend Lodge No. 235 of Benevolent and Protective Order of Elks of U.S.*, 893 N.E.2d 753, 757 (Ind. Ct. App. 2008). "[S]eparate written agreements between different parties which serve different purposes and which do not refer to each other, are not intended to be interdependent and do not combine to form a unitary contract." *Id.* (quoting 17A C.J.S. Contracts § 315 (1999)).

Under the circumstances of this case, it would not be proper to apply the contemporaneous documents rule to construe the transfer between First Security and Peoples and the transfer from Leasing Innovations to First Security as one transaction. Peoples acknowledges that First Security was not the originator of the lease and served as a broker in the transaction. [Peoples Credit Memo, Dkt. 75-3 at 1.] However, the transaction was structured such that there were two separate agreements between different parties. First Security became the owner of the lease under the first agreement, and then assigned its ownership interest in the lease to Peoples in a second agreement to which Leasing Innovations was not a party, nor was even mentioned. The agreement between First Security and Peoples states, "Assignor represents and warrants that the Assignor is the rightful owner of the Lease…." [Dkt. 73-4 at 1.] First Security, by its own

representation and warranty, clearly indicates that it became an owner in the chain of title of the lease. Peoples paid the full consideration directly to First Security, not Leasing Innovations. Additionally, there is nothing in the agreement between First Security and Peoples that references the assignment agreement between Leasing Innovations and First Security, or the transaction as a whole, and no indication that the parties intended for the two documents to be construed together as one transaction. For whatever reason, the parties chose to document and execute the assignment as two separate transactions, and the Court will not now go back and read language into the agreement that the parties themselves chose not to include. Thus the contemporaneous writing doctrine is inapplicable under the facts of this case where the two writings are separate with different parties to each agreement.

Since the Court has determined that the assignment between First Security and Peoples is an independent transaction, the question as to whether the parties can be returned to the status quo becomes clearer. As pointed out by Peoples, an exact return to the status quo is unnecessary, and the only showing that is required is that the parties may be substantially returned to the status quo. *Horine*, 505 N.E.2d at 806. Aside from the argument that the transaction was a three party arrangement, which the Court has already addressed above, First Security points to no other reason why the parties cannot be returned to the status quo by Peoples' return of the lease to First Security and First Security's return of the consideration to Peoples, minus payments already received from Wildwood. The "status quo" under these circumstances would be returning the parties to the point indicated in their agreement, which is where First Security was owner of the lease and Peoples was the assignee. Returning First Security to its position prior to its agreement with Leasing Innovations is not a matter presently before this Court and is irrelevant to deciding the rights and remedies between Peoples and First Security. Therefore, the Court finds that

Peoples has shown that the parties could be returned to the status quo if the remedy of rescission were to be granted.

### E. Materiality of the Mistake Regarding the Absence of Collateral

The parties also dispute the role that the value of the collateral played in Peoples' decision to approve the transaction. A mistake of fact may only be grounds for rescission of the contract if it is the efficient cause of the agreement, and is such that it animates and controls the conduct of the parties. *Stainbrook*, 842 N.E.2d at 397. Peoples argues that the existence and value of the collateral was a material consideration that motivated them into entering into the agreement, while First Security argues that other considerations primarily motivated Peoples in its decision.

As pointed out in Peoples' Response to First Security's Motion for Summary Judgment [Dkt. 83], there is a dispute of fact as to the value that Peoples placed on the equipment and role it played in Peoples' Board of Directors' decision to approve the loan and accept assignment of the Wildwood Lease. Peoples states that they valued the collateral based upon the purchase price of $1.8 million. However, both parties point to several e-mails between members of Peoples' Board stating that the collateral would have little value in the event of default because specialized equipment does not maintain its resale value, the bank essentially only had the personal guarantees as collateral, and that the Board voted to approve the transaction based upon Wildwood's financials and track record and the interest rate on the loan. [Dkt. 75-17.] Additionally, Hartz testified that approval of the transaction was based upon Wildwood's track record and the fact that their financials supported their ability to repay. [Hartz Deposition, Dkt. 75-6 at 24.] First Security's expert also testified that in situations where a loan is secured by specialized equipment, the lender looks to the borrower's ability to pay the loan in evaluating the

loan, not necessarily the value of the collateral. [Burdiss Deposition, Dkt. 83-11at 19; Burdis Report, Dkt. 75-21 at 12.]

In viewing the evidence in a light favorable to First Security, it cannot be said that Peoples is entitled to rescission as a matter of law. Conversely, viewing the facts in a light favorable to Peoples, it also cannot be said that First Security is entitled to judgment as a matter of law. The evidence presents a sufficient dispute of fact regarding the materiality of the mistake due to conflicting evidence of the role that the collateral played in controlling the parties' conduct such that summary judgment is not appropriate. While it may be true that Peoples may not have provided an unsecured loan had they known of Wildwood's fraudulent scheme at the time of the transaction, there is sufficient factual dispute as to how much Peoples relied upon the value of the collateral in entering into the transaction versus other factors, such as Wildwood's financial track record and the rate of return on the loan, and whether the collateral was a factor that "animated and controlled" the parties' conduct. Thus, the trier of fact will need to make the determination as to the materiality of the mistake, and neither party is entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, First Security's Motion for Summary Judgment [Dkt. 74] is **DENIED**, and Peoples' Cross-Motion for Summary Judgment [Dkt. 82] is also **DENIED**.

SO ORDERED.

Date: 01/25/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Anelia T.N. Ray
ROBERGE & ROBERGE
aray@robergelaw.com

Christopher S. Roberge
ROBERGE & ROBERGE
croberge@robergelaw.com

Elizabeth A. Roberge
ROBERGE & ROBERGE
eroberge@robergelaw.com

Matthew Thomas Albaugh
FAEGRE BAKER DANIELS, LLP - Indianapolis
matthew.albaugh@faegrebd.com

Mika Shadid Tucker
JACK NELSON JONES JILES & GREGORY, P.A.
mika.tucker@jacknelsonjones.com

Munjot Sahu
FAEGRE BAKER DANIELS, LLP - Indianapolis
munjot.sahu@faegrebd.com

Stephen W. Jones
JACK NELSON JONES JILES & GREGORY, P.A.
sjones@jacknelsonjones.com